# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

BRIAN WARRAN and LAURA
WARRAN,

                               Case No. 23-

           Plaintiffs,

V                               Hon.

HON. MICHELLE BIANCHI, Judge of the
Probate Court for Hillsdale County;
DIANA C. MOORE, Superintendent,
Michigan Children's Institute;
KASSONDRA A. CROSBY; JULIE
WRIGHT; LEEANN SCOTT, OPEN
DOORS ADOPTION AGENCY; ALICE
NICKERSON, Lawyer Guardian Ad Litem
for RB; ANDREA BRICKER;
HILLSDALE CASA, INC., a Michigan
nonprofit corporation; ANGELA
DRAPER; HEATHER UPTON; WYATT
TYLER and KELLY TYLER,

           Defendants.

---

## COMPLAINT

    Plaintiffs Brian Warran and Laura Warran, by counsel Williams, Williams,

Rattner & Plunkett, PC and Conklin Law Firm, PLC, state:

1.    <u>Identification of Parties, their roles and relationships with RB, a minor, a
former state ward; the State of Michigan's jurisdiction and authority over
RB who was adopted by foster parents on December 21, 2022.</u>

1

1.      Plaintiffs Brian Warran and Laura Warran ("the Warrans") bring this civil action against the named Defendants seeking a declaratory judgment based on the Defendants' acts and omissions that violated Plaintiffs' constitutional rights to substantive and procedural due process and equal protection of the law, rights guaranteed to them by both the 14th Amendment to the Constitution of the United States of America and the Constitution of the State of Michigan at Const (1963) art 1, §17.

2.      The Warrans are husband and wife and reside in Santa Claus, Spencer County, Indiana.  Brian Warran is the brother of Nancy Bailey ("Nancy") who gave birth to the minor child RB on or about May 2020.  The Warrans assert that Defendants engaged in a civil conspiracy to deprive them of their constitutional rights as more particularly alleged herein.

3.      This action is based upon a series of events that Plaintiffs assert divested them of their rights including but not limited to 1) the statutory right to, as RB's relatives, be given special consideration and preference for placement of RB in violation of MCL 722.954a(5); 2) the development of a family relationship with RB between the time he was removed from his parents and termination of the parental rights of Nancy and RB's biological father, Roger Raske ("Roger"), on or about January 4, 2022; and, 3) fairly and legally compete with the foster parents, Defendants Wyatt Tyler and Kelly Tyler ("the Tylers") for the state of Michigan's

consent to adopt RB between January 4, 2022 and December 21, 2022 the date

Honorable Michelle Bianchi signed the final Order of Adoption of RB by the

Tylers, which was less than 48 hours after the Warrans' receipt of notice that

Defendant Diana C. Moore, the Superintendent of the Michigan Children's

Institute (MCI) had denied them the consent to adopt.

4.      Defendant Diana C. Moore ("Moore" or "MCI Superintendent") is a

state employee assigned to the Michigan Department of Health & Human Services

("MDHHS") who, at all relevant times, was the appointed Superintendent of

Michigan Children's Institute ("MCI").  MCI is the division of MDHHS with

exclusive authority over children who become state wards after the termination of

their parents' rights.  The MCI Superintendent (or her designee) is the only state

employee authorized to determine who is entitled to have contact with state wards,

the frequency, and conditions of the contact and whether it requires supervision.

5.      Defendant Judge Michelle Bianchi, at all times relevant, was a probate

court judge for Hillsdale County who presided over 1) the child protective

proceedings involving RB and the establishment of jurisdiction over the child

pursuant to MCL 712A.2(b); 2) the removal of RB from the care and custody of

his parents; 3) the placement of RB in the Tylers' foster care home within Hillsdale

County; 4) the state's meager and unsuccessful efforts to provide social services

designed to reunify RB with his parents; 5) the termination of RB's parents'

3

constitutional rights; 6) the supervision of the Tyler's licensed foster care and foster home where whom RB was placed at five-weeks of age; 7) the subsequent post-termination court review and permanency planning hearings; and 8) the adoption of RB by execution of an Order of Adoption on December 21, 2022. Plaintiffs allege that Judge Bianchi violated their constitutional right to due process and denied them equal protection of law by departing from Michigan Court Rules and statutes and by her disparate treatment of Plaintiffs, relatives of RB, who, unlike the non-relative foster parents, were not given notice of proceedings directly affecting them, and an opportunity to be heard.

6.     Defendant Kassondra A. Crosby ("Crosby"), at all relevant times, was employed by MDHHS assigned to RB's case upon the child's removal from the care and custody of his biological parents, Nancy and Roger.  In her capacity as a MDHHS worker, Crosby was charged with administration, investigation and general oversight of cases of children removed from their parents based on neglect and/or abuse, after the state had acquired jurisdiction by order of the probate court.

7.     Defendant Julie Wright ("Wright"), at all relevant times, introduced herself as Crosby's supervisor, participated in the child welfare proceedings and supervised Crosby with the administration, investigation, communications, and general oversight of RB's case.

4

8.     Defendant Open Doors Adoption Agency ("Open Doors") is believed to be a Michigan non-profit child placing agency created pursuant to Michigan statute and licensed to supervise children in foster care placement after the child's parents' rights have been terminated.  In its capacity as a MDHHS contractor, Open Doors was charged with administration, investigation, and general oversight of the adoption of state wards, including RB, following the termination of the child's parents' rights.

9.     Defendant LeeAnn Scott ("Scott") is believed to be employed by Open Doors and assigned to provide adoption services in the case of RB after the goal was changed from possible reunification to adoption or other forms of permanency planning.

10.     Defendant Alice Nickerson ("Nickerson") is a member of the State Bar of Michigan and an attorney licensed to practice law in the State of Michigan. Nickerson, at all relevant times, was the successor lawyer guardian ad litem ("LGAL") for RB, having been appointed by Judge Bianchi pursuant to MCL 712A.17b.  Plaintiffs allege that Nickerson violated their right to due process and equal protection of the law, by intentionally departing from Michigan Court Rules, and statutory requirements including MCL 712A.17b and her professional responsibilities as a LGAL thereby interfering with the administration of justice.

01688325.DOCX

11.     Defendant Andrea Bricker ("Bricker") is believed to be either employed by or under contract to the State of Michigan to provide infant mental health services to children in foster care.  Defendant Bricker is believed to have a master's degree and be licensed by the State of Michigan as a limited professional counselor with an endorsement in infant mental health. Bricker was assigned to RB's case on April 5, 2022 for the purpose of monitoring his mental and emotional health and providing services.  Plaintiffs allege that Bricker, individually, violated their right to due process and equal protection of the law, by intentionally departing from her responsibilities thereby interfering with the administration of justice.

12.     Hillsdale CASA, Inc., ("CASA Program") is a Michigan non-profit tax-exempt 501(c)(3) corporation training volunteers in the community to advocate for children in foster care.  Defendant Heather Upton ("Upton"), at all times relevant, was the executive director and supervisor of the Hillsdale County CASA Program and Defendant Angela Draper ("Draper") was allegedly a trained, competent CASA (Court Appointed Special Advocate).

13.     Defendant Draper, supervised by Defendant Upton, was appointed by Judge Bianchi as the CASA assigned to RB's case and she was therefore authorized to attend hearings and make recommendations and reports related to the RB's needs and welfare.  Plaintiffs aver that Defendant CASA Program, Upton and

Draper violated their constitutional rights to due process and equal protection of law by permitting the actions of Draper while serving as a CASA, to impede, interfere with and impair the administration of justice when Defendants (including Draper) knew should have known that she lacked the education, experience, temperament and ability to act within her role as a CASA and, instead, was inappropriately taking on functions going far beyond the scope of her CASA assignment, as will be more particularly described herein.

14.    Upon information and belief, Draper's credentials include 30 hours of training and her appointment to RB's case authorized her (with Upton's knowledge and Judge Bianchi's permission) to weigh in and advocate for RB's best interests (from Draper's viewpoint) at meetings and court hearings.  Upon information and belief, Draper was not authorized to supervise RB's visits with his family members, the Warrans, although she departed from her authorized role, by stalking Plaintiffs during their family visits with RB, and enlarging her duties it to the point that Draper was visiting with RB at the Tylers' home nearly every day and thus played a large part in the outcome of the proceedings.

15.    At all times relevant, Defendant Moore, as MCI Superintendent, was also the only person, within the state government, authorized to consent to the adoption of state wards including those with more than one person (or married

couples) seeking consent to adopt the child, which is known as a "competing parties" adoption.

II. General Description of Plaintiff's Claims that their constitutional right to due process and equal protection of law were violated throughout the child welfare proceedings and based upon MCI Superintendent Moore's letter dated December 7, 2022 but not received by the Warrans until December 19, 2022.

16. The child welfare case of RB spanned 30 months during which Plaintiffs, the Warrans, consistently and repeatedly informed all Defendants herein named that they desired to adopt their nephew and have him placed with them for relative care and adoption.

17. Plaintiffs aver that, over a period of 30 months, Defendants Judge Bianchi, Moore, Crosby, Open Doors, Scott, Nickerson, Bricker, Draper, and the Tylers conspired and worked together in a concerted manner to accomplish unlawful purposes. These unlawful purposes include the failure to give Plaintiffs, as relatives, preference and special consideration for placement of RB. The Warrans, RB's adult relatives were, since RB's birth was willing to care for the child, known to Defendants to be fit and able to meet the child's developmental, emotional, and physical needs. Defendants had the assurance that the placement would be in the child's best interest, so their failure to place RB with them was in violation of MCL 722.954a(5). Defendants further conspired and acted in concert and by agreement to deny and interfere with Plaintiffs ability to, 1) establish and

maintain a relationship with RB; 2) exercise regularly scheduled visits with RB; and 3) fairly compete with the Tylers for consent to adopt RB.

18.     Plaintiffs further allege that Defendants' conduct was not undertaken in good faith and, instead, that Defendants intentionally departed from their lawful responsibilities and duties, all of which, ultimately, led to MCI Superintendent Moore denying Plaintiffs the consent to adopt RB.  By their conduct, Defendants left Plaintiffs without a judicial remedy to challenge the permanent loss of their relationship with RB and their ability to adopt him, or to even have an opportunity to challenge Moore's refusal to grant Plaintiffs consent to adopt as being arbitrary and capricious, a statutory right described in MCL 710.45.

19.     Not in controversy is the fact that the Warrans, "stated a desire for placement of RB from the onset of the case," as the MCI Superintendent acknowledged in her December 7, 2022, letter denying Plaintiffs consent to adopt.

20.     Although the letter denying the Warrans consent to adopt was dated December 7, 2022, the Warrans did not receive it until nearly three weeks later, as will be more particularly explained herein.

21.     As a direct and proximate result of Defendants' joint actions, RB was placed in foster care with Defendants Tyler from June 21, 2020, when he was removed from his parents, and December 21, 2022, when he was adopted by the Tylers pursuant to the consent to adopt by the MCI Superintendent.

9

22.     Plaintiffs further allege that, at all times relevant, the Tyler home did

not meet the safety and licensing requirements for a temporary foster home for

children removed from their parents under the child welfare laws or for adoptive

placement.  The Warrans, after a very brief investigation, were able to present

Defendants with evidence that the Tylers' adult son was permitted to live in the

foster home with RB although he has been convicted of numerous drug related

crimes and at least one violent felony.[1]

III.    <u>Although Plaintiffs have been denied and deprived their constitutional
        rights to due process and equal protection of law, there are no legal
        appellate remedies available to them in state court and, therefore, the
        United States District Court, is their only avenue of redress.</u>

23.     Plaintiffs have brought this action in the United States District Court

because, based upon the unlawful actions of Defendants, jointly and severally.

Plaintiffs have no legal recourse to challenge the conduct of Defendants within the

Michigan courts, Judge Bianchi having left no path by which they can appeal her

multiple errors of fact and law to the Michigan Court of Appeals, either by right or

by seeking leave to appeal.

24.     As more particularly stated herein, Judge Bianchi, rather than issuing

judicial decisions in response to Plaintiffs' motions and objections, simply returned

documents presented for filing to Plaintiffs' counsel. Judge Bianchi knew that by

---

[1] On the other hand, the Warrans and their minor children were subjected to high
level scrutiny and not a single instance of even questionable behavior was found.

not accepting Plaintiff's filings, the court could avoid issuing orders thereby leaving Plaintiffs with no claim of appellate jurisdiction in the Michigan court system.

25.     Unless remedied by this Court, the Warrans will remain permanently deprived of the right to be heard and challenge a decision of the superintendent of a state agency without any judicial review whatsoever.

26.     Plaintiffs assert that although MCL 710.45 appears to vest in them a right to a hearing if the MCI Superintendent withholds consent to their adoption of a state ward, the statute, on its face and as applied, in this instance is unconstitutional and the Order of Adoption must be vacated to afford Plaintiffs their right to challenge and attempt to prove that the MCI Superintendent's decision denying them consent to adopt was arbitrary and capricious.

27.     MCL 710.45 provides:

(1)     A court shall not allow the filing of a petition to adopt a child if the consent of a representative or court is required by section 43(1)(b), (c), or (d) of this chapter unless the petition is accompanied by the required consent, or a motion as provided in subsection (2).

(2)     If an adoption petitioner has been unable to obtain the consent required by section 43(1)(b), (c), or (d) of this chapter, the petitioner may file a motion with the court alleging that the decision to withhold consent

11

was arbitrary and capricious. A motion under this subsection shall contain

information regarding both of the following:

>     (a) The specific steps taken by the petitioner to obtain the consent
>         required and the results, if any.
>     (b) The specific reasons why the petitioner believes the decision to
>         withhold consent was arbitrary and capricious.

>    (3)   <u>If consent has been given to another petitioner and if the child</u>
>
> <u>has been placed with that other petitioner according to an order under</u>
>
> <u>section 51 of this chapter</u>, a motion under this section shall not be brought
>
> after either of the following:

>     (a) Fifty-six days following the entry of the order placing the child.
>     (b) Entry of an order of adoption.

> (Emphasis supplied).

28.     Plaintiffs were unable to exercise their statutory right to file a Petition

for Adoption and motion for the hearing authorized by MCL 710.45 (commonly

known as a "Section 45 hearing") because they received the MCI Superintendent's

December 7, 2022, denial of consent letter, by first class mail (postmarked on

December 13, 2022), after the Hillsdale County Probate Court had closed on

December 19, 2022.  Judge Bianchi, at or prior to 2:00 pm on December 21, 2022,

signed the Order of Adoption thereby finalizing the Tyler's adoption of RB

effectively severing all familial ties between Plaintiffs and RB leaving the Warrans

shocked and devastated just days before Christmas.

12

29.     Between December 7, 2022 (the date of the MCI Superintendent's letter denying consent) and December 19, 2022 (the date the Warrans actually received the letter), the Warrans' visits with RB (which had been illegally terminated by Judge Bianchi) had been reinstated by the MCI Superintendent and, therefore, the Warrans concluded their final visit with RB on December 18, 2022 at 6 pm, without any knowledge whatsoever that they would never see RB again. Plaintiffs allege that, at all times following December 7, 2022, Defendants knew that Moore had denied Plaintiffs consent to adopt, yet they joined in a civil conspiracy to not advise them and allow the visits to continue through December 18, 2022, the day before Plaintiffs received Moore's denial letter.

30.     Defendants undertook the described conspiracy with the goal of hiding, from the Warrans, that Superintendent Moore had denied them consent to adopt RB and, without such knowledge, the Warrans were very likely to be unable to meet the time requirements of MCL 710.45.

31.     The prerequisites to filing a motion for a Section 45 hearing are considerable and, before December 19, 2022, the Warrans had no knowledge that they had been denied consent, and, therefore, the statute's requirements were impossible for the Warrans to meet prior to Judge Bianchi signing the Order of Adoption, less than 48 hours after Plaintiffs received the notice.

01688325.DOCX

32.    The statute unequivocally requires that, before a person seeking MCI's consent to adopt a state ward may file a Petition for Adoption accompanied by a motion alleging the MCI Superintendent's denial of consent was arbitrary and capricious, the prospective adoptee must have been "placed with another petitioner according to an order under section 51 of this chapter."  (Emphasis supplied).

33.    The Warrans did not know and could not have known, from any source of information available to them or their counsel, whether RB had, in fact, been "[formally] placed with another petitioner," and, therefore, that their time to file a motion would expire in hours rather than the "56 days," referred to in the statute (and Superintendent Moore's notice).

34.    Furthermore, the MCI Superintendent's letter notifying the Warrans that they had been denied consent did not authorize them to file a Petition for Adoption (together with a motion for a Section 45 hearing) because MCL 710.45(3), clearly states that such authority is subject to, "consent [having been] given to another petitioner." Although Plaintiffs suspected that was probably the case, they were not notified that consent had been given to the Tylers and the lack of notice deprived them of their statutory and constitutional right to a Section 45 hearing.  (Emphasis supplied).

35.    For the reasons explained, the Warrans' statutory right to challenge the MCI Superintendent's decision was both illusory and meaningless as it applied

14

to their deadline and, in fact, the time expired less than 48 hours after their receipt of the notice.

36.     On December 21, 2022, at approximately 1:30 pm, Open Doors' worker Scott sent the following email to the Warrans:

> *Good afternoon, I am emailing to let you know that Judge Bianchi signed adoptions orders for R[B] today and the family has decided to cancel the upcoming visits.  Let me know if you have any questions.*

IV.     <u>Although the Warrans' due process rights were violated by the named Defendants throughout the child protective proceedings, the Warrans exercised visits from October 2021 through September 11, 2022, when Defendants' hostility and aggression towards Plaintiffs increased exponentially and culminated with Judge Bianchi's finalization of the Tylers' adoption of RB on December 21, 2022.</u>

37.     From RB's removal from his parents at age five weeks, Defendants, jointly and severally, engaged in acts and omissions designed to frustrate the Warrans' efforts to, first, be permitted reasonable visitation with RB.

38.     From June 2020 through October 2021, Defendants were not permitted any contact with RB, notwithstanding both federal and state policy and other authority that mandates that children removed from parents for neglect or abuse be placed with relatives prior to unrelated licensed foster care providers.

39.     Even though the Warrans were frustrated with the process, they did everything MDHHS asked them to do and patiently waited for visits to begin.

40.     The Interstate Compact on the Placement of Children ("ICPC") is a statutory contract among member states and U.S. territories authorizing them to

01688325.DOCX

work together to ensure that children who are placed across state lines for foster care or adoption receive adequate protection and support services. Michigan's ICPC statute is MCL 3.711.

41.   Crosby, the DHHS worker with principal responsibility to communicate with the Warrans, repeatedly told them that until ICPC investigated their background, RB could not be placed with them nor could they visit RB, although visits would eventually be approved.

42.   The Warrans, themselves, had previously worked with the Indiana counterpart of MDHHS when they agreed to provide fictive kin care for a teenager who had been removed from her home or otherwise needed a foster home like setting.

43.   Because the Warrans were acquainted with the Indiana child welfare authorities, they repeatedly asked their worker why they were unable to see RB because they had been investigated for their fictive kin placement, raised five (5) children of their own, had no criminal background, were financially secure and respected members of their community.

44.   The Indiana authorities told the Warrans that it was likely that the Michigan ICPC office would be sending the Indiana ICPC a request for investigation and, once that was received, approving the family for placement of RB with them would take a matter of six to eight weeks.

01688325.DOCX

45.     Soon after RB's removal, Crosby told the Warrans that RB could not be placed with them because MDHHS was in the process of providing services to Nancy and Roger (once he was confirmed to be RB's biological father), and the services would be too difficult to provide if RB was not located in Michigan when, in fact, this was not true.

46.     The Warrans' visits with RB were not scheduled until after the rights of RB's parents had been terminated in October 2021, when he was 16 months old.

47.     Indiana ICPC told the Warrans that they received the Michigan ICPC request in August 2021, although Crosby had falsely told the Warrans throughout the first 14 months of RB's placement with the Tylers, that she did not know why the ICPC authorization was so slow, that she was sure that Indiana was holding up the process, but she would check with ICPC and let them know.

48.     During a pre-termination hearing, RB's then LGAL informed Judge Bianchi that the Warrans would be an ideal relative placement for RB and Nancy, who was present, expressed approval of the placement.

49.     Throughout this time Crosby was aware that the Warrans believed and expected that RB's placement would be removed from Michigan to their Indiana home when ICPC approval was final.

50.     The Warrans' first visits were two hours in length and supervised by MDHHS workers in the Hillsdale County Office.

17

51.     The Warrans round-trip drive for the short, supervised visits was 12 hours and, although Crosby stated that visits must occur during MDHHS working hours (Monday through Friday), the Warrans put their jobs in jeopardy to make the long trip to see RB.  The Warrans never canceled, nor were they late.

52.     In May 2022, the duration of the Warrans' visits with RB had been increased notwithstanding the protests of foster mother, Kelly Tyler.  Visits scheduled for May 15 and 16 were canceled by means of a May 12, 2022, voice mail message from Crosby who stated RB had a high fever and ear infection. Crosby also notified the Warrans that visits the following weekend May 22 and 23 would take place, however, the Warrans would be give an extra one-half hour (from 3 until 6:30) to accommodate a visit between them and "Infant Mental Health Specialist" Bricker.

53.     On May 20, 2022, Crosby notified the Warrans, again by voice mail, that the visits for May 22 and 23 were canceled because, although he appeared to be "on the mend," he had since been exposed to COVID.

54.     On June 14, 2022, a Family Team Meeting ("FTM") was held via Zoom technology during which a somewhat heated dispute arose after Draper, Bricker and Kelly Tyler all protested the fact that RB was scheduled for his first overnight with the Warrans over the July 4 holiday.  The meeting was also attended by the Warrans, with their attorney, Donna Medina, and the Tylers  with

their attorney Evelyn Calagaro.  The Warrans' attorney suggested that she would initiate a conference call with the MCI Superintendent the following day, June 15, 2022, to determine if MCI supported the withdrawal of overnight visits.

55.     Then and there, on Zoom, all participants agreed to the joint telephone conference with MCI and Attorney Calagaro, specifically, stated that she wanted to be included in the discussion with MCI.  Plaintiffs allege that this agreement, in particular and standing alone, is evidence of a conspiracy and plan to deprive Plaintiffs of their first overnight visit with RB, as explained below.

56.     On June 15, 2022, Plaintiff's counsel was not successful reaching the MCI Superintendent to set up the joint meeting.

57.     However, on June 15, 2022, at 4:11 PM Superintendent Moore forwarded an email to the meeting participants (except for Plaintiffs and their counsel) which clearly demonstrates that the attendees at the FTM the day before had no intention of including Plaintiff's counsel in their meeting with Superintendent Moore.

58.     On June 16, 2022, Crosby's supervisor, Wright, phoned Laura Warran to inform her that MCI had canceled their overnight visits with RB.  When Laura Warran asked for an explanation, Wright stated that the MCI Superintendent had just made the decision.

19

59.     The Superintendent's email suspending the Warrans' overnight visits clearly demonstrates that all Defendants in attendance at the June 14, 2022, FTM knew that "the team" had either already been in contact with the MCI Superintendent or intended to meet with her without Plaintiffs' counsel present. Clearly, during this meeting, the participants reported to superintendent Moore that RB was reacting so poorly to the visits with his relatives that the visits should be immediately suspended.

60.     As a result, the MCI Superintendent reported that she had, "no choice but to suspend the **overnight visits** at this time."  (Emphasis in original).

> The email, itself, is reproduced below:
>
> **From:** Moore, Diana (DHHS) <MooreD43@michigan.gov>
> **Sent:** Wednesday, June 15, 2022 4:11 PM
> **To:** Crosby, Kassondra (DHHS) <CrosbyK3@michigan.gov>; LeeAnna Scott <lscott@opendooradoptionservices.org>; Wright, Julie (DHHS) <WrightJ7@michigan.gov>
> **Cc:** alice@bucklinlawplc.com; Fox, Carita M. (DHHS) <FoxC3@michigan.gov>; OBerry, Danielle (DHHS) <OBerryD1@michigan.gov>
> **Subject:** R.B. Visits with Relative
>
> Hello
>
> I have carefully considered all of the information and opinions you have provided.  Given the majority of the team have concerns with how R[B] is reacting to the extended visits I feel I have no choice but to suspend the **overnight visits** at this time.   (Emphasis in original email).
>
> **Diana C. Moore**, **Superintendent**
> Michigan Children's Institute
> 235 S. Grand Avenue, Suite 514
> Lansing, MI 48909
> (248)763-7297  *** Note new number

61.    The Superintendent's responsive email strongly suggests that during the June 14, 2022 FTM, the participants (except for Plaintiffs' attorney) knew that their agreement to a joint conference call with MCI on June 15, 2022, was a ruse, false and designed to mislead the Warrans into believing that they would be included in the discussion with the MCI Superintendent when the meeting attendees (but for the Warrans and counsel) knew that *the fix was* in, and the "team" had already persuaded Moore to cancel the overnight visits having convinced her that she, "[had] no choice but to suspend the **overnight visits** at this time."

62.    The visit scheduled for June 18, 2022, was unilaterally canceled, with no makeup time afforded the Warrans.  Although the Warrans traveled to Hillsdale County Probate Court to attend the hearing before Judge Bianchi, Crosby denied the Warrans request to see RB.

63.    Shortly following the June 18, 2022, hearing, Open Doors' adoption worker Scott sent the Warrans an application for the Michigan adoption subsidy and Medicaid for RB which the Warrans declined, and informed Scott they had no interest in applying for.  Specifically, the Warrans informed Scott that they would not be pursuing adoption of RB unless they were able to financially support him and provide him private health insurance.

01688325.DOCX

64.     Throughout the summer months, Defendants' attitude towards the Warrans was increasingly antagonistic.

65.     During Warrans' September 10, 2022, visit with RB, they were alarmed about what appeared to be a fresh burn on the back of their nephew's left hand and the same type of injury on his right elbow, although the elbow injury appeared to have aged and looked like a burn scar rather than a fresh burn.  RB also had scratches and faded bruises on his face and his penis appeared to be red and inflamed.

66.     Due to these injuries and RB's verbalization about the burn, Plaintiffs became concerned for the child's health and welfare.  Their concern was not limited to the injuries they observed on September 10, 2022, but included earlier injuries the Warrans reported to MDHHS (through Crosby), Open Doors (through Scott), MCI and Superintendent Moore, none of whom ever gave a reasonable explanation for why RB had so many bumps, bruises, and scratches.

67.     Besides his observable injuries, Bricker, CASA Draper, MDHHS (through Crosby) and Open Doors (through Scott), made continuous complaints about RB's state of "dysregulation" after visits with the Warrans, even visits as short as four hours duration, and the severity of the "dysregulation" was reported to be more and more serious throughout the 10 month period that the Warrans were

able to visit RB without being supervised by MDHHS and Crosby at the local MDHHS office.

68.     Due to RB's injuries noted by the Warrans on September 10 and 11, 2022, they presented the child to the county sheriff's department to make a record of their nephew's injuries and, at least, to receive instructions on the best course of action.

69.     At the time of their visit to the sheriff's department, in addition to the new injuries to RB, the Warrans were also very concerned that Defendants had previously falsely attributed RB's injuries and symptoms to the Warrans' conduct during their visitation with RB, a theory Bricker promoted as more particularly described in Paragraph 85 E, infra.

70.     The deputy sheriff directed the Warrans to present RB to an emergency room so a physician could evaluate the injury and scar.

71.     Plaintiffs' attorney immediately sent an email to MCI Superintendent Moore, two of her consultants, as well as Crosby and Wright, to inform all parties of the injuries, visit to the sheriff's office and that the Warrans were enroute to the hospital emergency room and would keep those contacted informed because RB was due to be returned to the Tylers at 6 pm.

72.     Pursuant to the sheriff deputy's instructions, the Warrans presented RB to the emergency room where he was evaluated by the emergency room

physician who agreed that the injuries looked like burns, he could not confirm how RB could have sustained them, nor that they were based on negligence or abuse.

73.     Shortly after 6 pm, the Warrans returned RB to the Tylers in the parking lot of the MDHHS officer where the exchange of the child was to take place.  The Warrans' attorney notified MCI that the child had been examined and would be returned to the Tylers.  After the Warrans arrived, the Sheriff Deputy left the building with the Tylers and supervised the exchange of the child.

74.     On September 28, 2022, Guardian Ad Litem Alice Nickerson, filed an "Ex-Parte Motion to Suspend Visits," seeking a temporary restraining order ("TRO") to immediately stop the Warrans' family visits with RB, alleging that irreparable harm would befall the child if visits were to continue.

75.     The issuance of TROs, defined by Michigan Court Rule as an extraordinary remedy, is governed by strict requirements set forth in MCR 3.310(B).

76.     Michigan Court Rules restrict the issuance of TROs to those cases where an extraordinary remedy is required because notice itself will cause, "immediate and irreparable injury, loss, or damage… to the applicant from the delay required to effect notice or from the risk that notice will itself precipitate

adverse action before an order can be issued."[2]  (See MCR 3.310(B)(1)).  GAL

Nickerson's Ex Parte Motion to Suspend Visits contained none of the required

allegations including the requirements set forth in Subparagraphs (a), (b), and (c).

Specifically, an ex parte restraining order can be issued, only if:

> (a)     it clearly appears from specific facts shown by affidavit or by a verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant from the delay required to effect notice or from the risk that notice will itself precipitate adverse action before an order can be issued;
>
> **NO SUCH FACTS WERE INCLUDED BECAUSE NO SUCH FACTS EXISTED.**
>
> (b)     the applicant's attorney certifies to the court in writing the efforts, if any, that have been made to give the notice and the reasons supporting the claim that notice should not be required;
>
> **NO SUCH CERTIFICATION WAS INCLUDED BECAUSE NO SUCH EFFORTS WERE MADE, NOR DID ANY FACTS EXIST THAT WOULD SUPPORT ISSUANCE OF THE TRO WITHOUT NOTICE; THIS IS TRUE ALTHOUGH GAL NICKERSON WAS WELL AWARE THAT THE WARRANS WERE REPRESENTED BY THE UNDERSIGNED COUNSEL.**

---

[2] In fact, any allegations that a TRO was necessary to prevent and save RB from sustaining irreparable injury, loss, and damages were completely false since the Warrans did not have another scheduled visit with RB for two weeks and the foster parent, Kelly Tyler, frequently canceled family visits, some just as the Warrans were completing their 6-hour drive to Hillsdale.  Thus, there was never even a remote possibility that, "irreparable injury, loss, or damage [would be caused] to the applicant from the delay required to effect notice or from the risk that notice will itself precipitate adverse action before an order can be issued."

01688325.DOCX

(c)    a permanent record or memorandum is made of any nonwritten evidence, argument, or other representations made in support of the application;

**PLAINTIFFS DO NOT KNOW WHETHER GAL NICKERSON WAS ABLE TO MEET WITH JUDGE BIANCHI TO MAKE REPRESENTATIONS IN SUPPORT OF THE APPLICATION BUT, EITHER WAY, THERE WAS NO REFERENCE TO A PERMANENT RECORD OR MEMORANDUM TO SUPPORT THE APPLICATION THAT PLAINTIFFS WERE MADE AWARE OF.**

76.    Therefore, GAL Nickerson's petition to suspend the Warrans' visits with RB, without notice to the Warrans, was not supported by the required showing that irreparable injury, loss, or damage would occur unless the ex parte restraining order was granted.  Moreover, Nickerson's allegations were all based on inadmissible hearsay and there was no verification by any of the several workers cited as corroborating witnesses or Ms. Tyler.

77.    In fact, one such "reporter" of information, Jason Macie, who allegedly made several statements contained within the ex parte motion, told the undersigned counsel, after being served with the order, that he had absolutely nothing to do with the petition for injunction and had just learned about it.

78.    Remarkably, however, on September 28, 2022, Judge Bianchi, on GAL Nickerson's Motion to Suspend Visits, suspended the Warrans visits <u>not</u> "until further order of the Court," but without a scheduled hearing nor termination date.

26

79.     Incredibly, the preamble to the Ex Parte Order issued by Judge Bianchi, read that, based on GAL Nickerson's motion, the court found that, "it appears irreparable harm or injury will occur to the children [sic] in the delay required to effective notice," then ordered, "Suspend the relatives', Brian Warren[sic] and Laura Warren [sic] visits with the minor child RB."

80.     <u>Judge Bianchi's order did, however, contain the following "Notice"</u>

This ex parte order will automatically become a temporary order if no written objection or motion to modify or rescind the ex parte order and a request for hearing are filed. The written objection or motion and the request for hearing must be filed with the clerk of the court and a copy provided to the other interested parties within 14 days after the date this order is served.

81.     Notwithstanding the "Notice," the petition for ex parte order and the order itself were defective and noncompliant with the requirements of the court rules in the following ways:

1)     It was not endorsed with time of issuance, as required by MCR 3.310(B)(2)(a);

2)     It did not describe the injury and state why it is irreparable and why the order was granted without notice, as required by MCR 3.310(B)(2)(b);

3)     It did not set a date for hearing at the earliest possible time, nor did it contain an order to show cause why a preliminary injunction should not be issued as required by MCR 3.310(B)(2)(c).

82.     Therefore, in compliance consistent with Judge Bianchi's "Notice," the Warrans filed an *Objection* (to the Ex Parte Order) and an *Answer* (to the Ex

Parte Motion) and sent both to the Hillsdale County Probate Court and Judge

Bianchi.

83.    The Warrans' undersigned counsel was, therefore, shocked to receive,

within a few days, a letter, on Judge Bianchi's stationary, that read:

> Dear Attorney Medina:
>
> This Court has received your objection and request for an evidentiary hearing in the matter of RB. We are returning your filing as your client is not an interested party for the purposes of objecting to a court order. Judge Bianchi has not reviewed your filing, and her honor is not authorized to make a decision regarding a competing party seeking adoption of an MCI ward. Any further filings should be directed toward MCI.
>
> Thank you for your time and attention to this matter.
> Sincerely,
>
> [Name]
> Judicial Assistant

84.    Therefore, although the Warrans were bound by an illegal and

defective Ex Parte Order, issued on a defective Ex Parte Motion, if the Judicial

Assistant was being truthful, Judge Bianchi, Judge of the Hillsdale County Probate

Court, allowed a clerical aid to reject documents presented for filing with the

Court, without permitting Judge Bianchi to even review the documents.

85.    The Warrans' right to access the justice system was even further

trampled by Judge Bianchi, again by refusing to accept documents presented to her

for filing as was the right of the Warrans under MCR 2.209, as will be presented below.

86.     Astonishingly, the Judicial Assistant's decision may not be as serious a violation as Judge Bianchi's because, first, she is not a practicing attorney and, also, she was correct about jurisdiction resting with MCI.

87.     What the Judicial Assistant obviously failed to understand, however, was that usurping the authority of MCI and Superintendent Moore, Judge Bianchi violated both the substantive and procedural rights of the Warrans, and left the Warrans at the mercy of herself, a judicial clerk, who was able to block the Warrans access to the judicial system and thus have nowhere to go for recourse or relief from what the Warrans were required to honor as a valid court order.

88.     On October 21, 2022, the Warrans, still being denied their rights to visit RB, and aggrieved by the Court's orders terminating the visits authorized by MCI, filed a Motion to Intervene in the child welfare case.

89.     MCR 2.209 governs the intervention of right by nonparties to a civil action and permissive intervention by nonparties to court proceedings.  The Warrans asserted a right to intervene based upon their well-known interest in adopting their nephew RB.  In fact, when MDHHS made its decisions to place five-week old RB with the Tylers, local foster parents whose background should have disqualified them from being licensed for foster care, MDHHS disregarded

the strong federal and state policy preference for placement of children removed

from their parents with relatives over strangers.  The preference is not a suggestion

but a mandate, as will be more fully shown herein.

90.     The Warrans' Motion to Intervene under MCR 2.209, was also

returned with another hand-written notice from Judge Bianchi's Judicial Clerk

notifying Plaintiffs that they lacked standing to file any court documents.

91.     By means of unlawful court orders, Judge Bianchi effectively

disposed of the Warrans' statutory right to "compete" with the Tylers to adopt RB,

which right is based and founded upon unique familial relationships accorded

constitutional protection. See, e.g., *Meyer v Nebraska*, 262 US 390, 399 (1923).

Thus, when Judge Bianchi, through her judicial aide, refused to accept for filing

the Warrans' objections, answers and motions related to her court orders

terminating the Warrans' rights, the Court unlawfully interfered with rights vested

in them by MCI which rights were, at all times, supported by federal and state

policy and Michigan statute.

V.     <u>Specific intentional acts of the named Defendants that violated Plaintiffs'
       constitutional right to due process of law.</u>

92.     Plaintiffs, based upon observations and communications with the

named Defendants throughout RB's foster care placement, aver that Defendants

were united in their support of the Tylers to be RB's adoptive family,

notwithstanding facts that should have disqualified them from being licensed as

30

foster care, and the best interests of the child and that Defendants acted in concert

with each other to achieve the result they desired, to permanently separate RB from

his family and, by doing so, the Defendants violated Plaintiffs' constitutional right

to due process and equal protection of law:

      A.    <u>Defendant Judge Bianchi</u>.  Judge Bianchi issued at least two court orders that she was not legally authorized to issue and, in doing so, usurped the exclusive authority of MDHHS and MCI, by its Superintendent, Diana C. Moore.  Judge Bianchi's orders were entered based upon false and uncorroborated allegations made by the various Defendants throughout the pendency of the case.  The first order, which reduced the Warrans' visits by 50%, was at least partially based on the false allegations of the CASA, Draper, who departed from what should have been a defined and limited role in this case.  Instead, Judge Bianchi allowed Draper to make highly emotional statements during the post-termination permanency planning hearings, and never appeared to challenge Draper's inappropriate recommendations such as encouraging Judge Bianchi to recognize that the MCI Superintendent, herself, was guilty of child abuse for directing that the Warrans' visits with RB, progress over time from a few hours supervised by a MDHHS worker to include full days, followed by overnights during weekends and holidays.  Although Draper's statements to Judge Bianchi were highly inflammatory and critical of the Warrans, Judge Bianchi did not advise Draper that her words and actions were inappropriate, but rather, allowed and encouraged Draper to exceed her role as a CASA, a judicially created position Judge Bianchi defined as her "eyes and ears," a definition that vested the CASA (a person with no known qualifications beyond 30 hours of "training"), with a tremendous amount of control and power to influence the other professionals involved in RB's case.

           Judge Bianchi further refused to afford the Warrans due process of law and the ability to bring to the court's attention that the orders she issued were unauthorized by statute or court rule.  Judge Bianchi either explicitly or implicitly authorized her

"judicial assistant" to informally correspond with Plaintiffs' counsel citing, as law, her own interpretations of Plaintiffs' legal standing, and to decide whether filings would be accepted or returned to Plaintiffs' counsel, thereby acting as a "gatekeeper" of crucial information Judge Bianchi appeared to not know because, if she had known that the bases for her actions were false statements and exaggerated claims, Plaintiffs would have been afforded relief rather than a denial of their constitutional due process rights.  Plaintiffs allege that there was never an emergency that required Judge Bianchi to issue ex parte orders then refuse to permit Plaintiffs to question them. Judge Bianchi's actions directly violated Michigan statutes and court rules, which effectively (and quite literally) closed the courtroom door to Plaintiffs and their counsel.  Judge Bianchi, further, appears to have authorized her "judicial assistant," to literally "unfile" Plaintiffs' motions and reports as evidenced by more than one document bearing a date stamp marked "FILED" where "FILED" was crossed over in pen before the documents were returned to Plaintiffs' counsel.  Acting through her "judicial assistant," Judge Bianchi also refused to accept Plaintiffs' Motion to Intervene that was properly filed pursuant to MCR 2.209, with the motion fee tendered, writing on the motion that Plaintiffs did not have standing in the case.

Only after Plaintiffs' counsel directly confronted Judge Bianchi's "judicial assistant" related to the court's lack of jurisdiction over visits between the Warrans and RB did Judge Bianchi rescind the temporary restraining order- injunction on October 24, 2022, although she never rescinded the order shortening the visits which was also legally improper and outside the court's authority.

Judge Bianchi further authorized her "judicial assistant" to return, unprocessed, Plaintiff's Motion for Relief from Judgment the Warrans filed after the court finalized RB's adoption by the Tylers, to make a record of the due process violations of the Warrans' constitutional rights citing the United States Constitution and the Michigan Constitution prohibition against states, "depriving a person of life, liberty or property without due process of law." US Const, Am XIV; Const 1963,

art 1, § 17. Because the "judicial assistant" believed the December 21, 2022 Order of Adoption warranted the immediate return of Plaintiffs' motion for relief from judgment with a sticky note stating, "case closed," and a $20 dollar bill appended, Plaintiffs were denied the entry of a court order that could be appealed to the Michigan Court of Appeals, leaving Plaintiffs with no avenue to protest but this Honorable Court.

Plaintiffs allege that Judge Bianchi delegated her judicial authority to her clerical aide or, if Judge Bianchi was unaware of the "judicial assistant's" actions, then the probate judge willfully and intentionally failed to take actions required to uphold the integrity and independence required of Michigan Judges and, by departing from the Code of Judicial Conduct, violated Plaintiffs' constitutional right to due process and equal protection under the law.

B.    <u>Defendants Crosby and Wright</u>.  MDHHS worker Crosby was, at all times relevant, the primary worker assigned to communicate with the Warrans about the child welfare case involving RB.  Defendant Wright was Crosby's supervisor who approved her actions throughout the pendency of the child welfare case.  Plaintiffs allege that Crosby was part of the conspiracy to deny Plaintiffs their constitutional rights and was instrumental in the 12-day delay between Defendant MCI Superintendent's December 7, 2022 denial of consent to adopt and the Warrans' receipt of the notice on December 19, 2022. Crosby repeatedly made untrue statements to the Warrans, and several times notified them that their MCI-approved visit with RB had been canceled by the Tylers for unexplained, imprecise reasons including vague reports of illness.  Crosby conveyed nonsensical explanations to the Warrans when they asked why RB was presented to them for visits with scars, bruises, scratches, and burns including, in one case, a story about RB having a collision with a refrigerator in the Tyler home.

At all times, Crosby was well aware that the Warrans' drive from home to Hillsdale County was approximately six hours one way yet, for months, she insisted that MDHHS would only allow family visits during normal business hours, thus making

the Warrans chose between visiting RB and going to work which, in all instances, ended with the Warrans choosing RB over their work-related obligations.

On June 17, 2022, Wright and Crosby presented the Warrans with a "safety plan," the reason for which was nebulous but inferred that the Warrans would allow contact between RB and his terminated parents when nothing like that had ever happened.  The Warrans believe that the "safety plan" was to retaliate for Laura Warrans' questions about Kyle Tyler's interaction with RB and to memorialize a false concern about the Warrans' activities during their visits with RB.

In June 2022, Laura Warran contacted Crosby to inquire about the interaction between RB and Kyle Tyler, the Tylers' son, a violent felon convicted of multiple drug offenses including the manufacturing of methamphetamines in the home of Ms. Tyler's mother where he was living as a condition of his probation or parole during the state's COVID restrictions. Although Crosby, at first, feigned lack of any knowledge of the Tylers' son and disbelief at Laura Warran's information, as the conversation went on Crosby admitted knowing about the son but stated that she, "couldn't say more," to protect the Tylers' privacy.  Although Crosby stated, during a virtual family team meeting at which Plaintiffs and all Defendants were present, that she could not and would not interfere with or change MCI's visitation schedule, she failed to inform the Warrans that their stated intentions to contact MCI for direction the next day would be futile since, only a day before, Defendants had met with Superintendent Moore and convinced her that RB's first overnight visit with the Warrans would place him in grave danger of emotional trauma.

Crosby, throughout the case, misrepresented, as factual, various allegations made by the other named Defendants when she knew or should have known that the claims and statements were untrue and incapable of verification.  Crosby falsely told the Warrans that RB would be presented to his pediatrician to be tested for allergies based on the Warrans' family history of

severe allergies, when she knew that the statement was untrue and misleading.

Further, throughout the case, Crosby settled disputes between the Warrans and Tylers by siding with the Tylers while in active concert and participation with Defendants in their conspiracy to deny Plaintiffs their constitutional rights.

In a final act of deceit, Crosby assured the Warrans that she was "working on" the December 2022 visitation schedule (including their holiday visit) after she knew the MCI Superintendent had denied them consent to adopt RB.

Had Crosby not conspired to deceive the Warrans about the status of their visitation schedule, Plaintiffs would likely have had time to prepare their motion under MCL 710.45, rather than being time-barred less than two business days after receiving the notice that Judge Bianchi entered the Order of Adoption on December 21, 2022, and all visits were canceled.

As a further consequence of Crosby's final act of deceit, the Warrans and their children were denied the opportunity to have a final visit with RB to celebrate Christmas and, instead, Crosby subjected them to the cruel realization, four days before the holiday, that they would never see RB again.  Crosby knew or should have known that RB's cousins, who are minor children, would be devastated by the MCI Superintendent's decision, yet she did nothing to ameliorate their pain and mental anguish resulting from the loss.

C.  <u>Open Doors, by its agent and representative Scott (and Scott in her individual capacity).</u>  Scott and, therefore, Open Doors, were fully aware of the plan to engage in concerted actions and omissions designed to deny the Warrans their constitutional rights to due process of law.  Scott was also present during permanency planning hearings and family team meetings ("FTMs") when the Warrans were intentionally misled about the status of the case and their desire to adopt RB.  Defendants failed to notify the Warrans that MCI had denied them the consent to adopt RB and contacted the Warrans only after the

adoption was finalized.  Defendants, through Scott and Scott individually, was therefore part of the organized conspiracy to deprive the Warrans of their statutory right to a hearing under MCL 710.45 and therefore constitutional right to due process of law.

D.     <u>Defendant LGAL Nickerson</u>.  At all times relevant, Nickerson served as the second or successor court appointed Lawyer Guardian ad Litem ("LGAL") for RB and therefore had a duty to oversee the child's progress and represent him and his interests in an unbiased manner, as an individual, throughout the child welfare proceedings and adoption.  Nickerson, further, was a licensed attorney practicing within the State of Michigan, and therefore knew or should have known, that the ex parte motion she drafted and filed with the Court September 23, 2022, contained numerous misrepresentations and false statements.  As an example, GAL Nickerson alleged that the recitation of facts supporting the ex parte order terminating the Warrans' visits with RB were true including that MDHHS's investigator Jason Macie had verified and corroborated specific facts when, in fact, Mr. Macie later advised Plaintiffs' counsel that he did not participate, in any manner, in the preparation of the motion and had only learned about it only after the order was issued.

Defendant Nickerson as the successor or second LGAL Judge Bianchi had appointed for RB, knew or should have known that her predecessor had represented to Judge Bianchi, during an early pre-termination hearing, that the Warrans were an appropriate family placement for RB and that the ICPC investigation should be immediately commenced.  Nickerson, further, knew or should have known that RB's mother, Nancy, supported the child's placement with the Warrans even if the move to Indiana effectively terminated the MDHHS efforts to return RB to her custody.  Nickerson, nevertheless, took no action whatsoever to ensure that the ICPC investigation was promptly ordered and, in fact, explained to Warrans' legal counsel, as late as April 2022, that she had not yet had time to travel to the Warrans' southern Indiana home to visit RB when, in fact, RB had never left the Hillsdale, Michigan home of the

Tylers which fact was obviously unknown to Defendant Nickerson.

During a subsequent phone conversation between Nickerson and Plaintiff's counsel Medina, Nickerson informed Plaintiff's counsel that she was supporting the Tylers which was months before MCI had issued its decision.

Defendant Nickerson knew or should have known that MCR 3.310 controlled the legal requirements to request the extraordinary remedy of a temporary restraining order and that, only under exceptional circumstances, were Plaintiffs not entitled to notice of her efforts to secure an injunction from Judge Bianchi. Nickerson, further, knew or should have known that, if she convinced Judge Bianchi to issue the injunction without notice, the court rule required a hearing be promptly convened to allow the restrained parties an opportunity to be heard.

Nevertheless, and notwithstanding knowledge of the prerequisites, Nickerson based her motion on uncorroborated, unverified, and patently false statements with the specific intent to bypass notice to the Warrans. Nickerson, further, did not seek out information from the court to determine whether the Warrans had timely objected to the temporary restraining order, nor did Nickerson contact the Warrans' counsel for information although she knew they were represented throughout the time she served as RB's LGAL. Thus, by her intentional acts and omissions, Nickerson became an integral part of the conspiracy to deprive Plaintiffs of their constitutional rights to due process of law.

E.   <u>Defendant Bricker</u>. Bricker, at all relevant times, was a licensed provider of infant mental health services retained by the MCI Superintendent to evaluate RB's mental and emotional health and design a program to treat his deficits to the extent they existed. As part of her treatment program, Bricker spent several weeks creating, from hand and not aided by a computerized program, a scrapbook she entitled, "RB's Story," which Bricker told the Warrans was designed to help RB

"remember the people who loved him."  As part of her efforts, Bricker repeatedly requested information about RB's birth and pictures of themselves and their children.  Bricker also demanded that the Warrans attend scrapbook meetings with her during the time they were scheduled to visit RB thus interfering with and reducing their interaction with RB.  Once Bricker completed her scrapbook, she summoned the Warrans to a final scrapbook meeting during which Bricker presented Warrans with one of three copies of the finished project which, according to Bricker, was a large part of RB's therapy.  Bricker then instructed the Warrans to bring the scrapbook to every visit and spend the time necessary to go through all the pictures and point out the individuals to RB and explain that he had love coming at him from all directions.

Defendant Bricker's motives for the scrapbook publication were extremely upsetting to the Warrans. Defendant Bricker had placed the Warrans' pictures at the end of the book while the Tyler family, including their son, who was then serving time in prison, appeared on the first pages along with familial labels such as "Your Mom," "Your Brother," "Your Grandma," etc.  Bricker also "cut out" RB's mother, Nancy, from the family pictures provided by the Warrans. Egregiously, Bricker placed photos of the Tylers adjacent to the photos of RB shortly after his birth.

The Warrans contend that Bricker's objectives in creating the scrapbook included the intentional effort to diminish the importance of the Warrans and other members of RB's family of origin while making it very clear to the Warrans that, from Bricker's viewpoint, the MCI Superintendent's decision had been made and they would be denied consent to adopt RB.

Bricker, further, diagnosed RB with numerous emotional maladies, many of which she clearly had not observed herself. Instead, Bricker relied upon information supplied to her solely by Kelly Tyler who reported to Bricker unusual and even impossible behaviors on RB's part attributing them all, including his "dysregulation" which lasted for 10 days, to the few hours Plaintiffs spent with RB.

Notwithstanding Kelly Tyler's ever-growing list of RB's emotional responses following the family visits, Bricker accepted her reports without question and never asked Plaintiffs if they had experienced or observed the reported behaviors. Conversely, the Warrans had taken pictures and videos of RB throughout their visits many of which completely contradict Kelly Tyler's reports and show him to be a happy, smiling child.  Bricker insisted that RB would randomly seek out strangers for affection and exhibited no fear of approaching unknown people, a phenomenon Bricker called "lack of stranger danger," which she tied to RB's visits with the Warrans. Had Bricker questioned the veracity of Kelly Tyler's reports, the Warrans could have provided evidence that RB exhibited appropriate trepidation and even needed assurance that the Easter Bunny would not harm him.  Bricker, further, verified that Kelly Tyler appeared exhausted during RB's therapy, and attributed her extreme fatigue to her necessity to comfort RB for 7-10 days following family visits because, during that entire time span, RB could not fall asleep which required Kelly Tyler, also, to not sleep for 7-10 days.  Bricker appeared to accept, again, as true, the suggestion that the only person capable of calming RB was Kelly Tyler and if RB wasn't physically in her arms, he was in a state of "dysregulation."  As a person trained in providing infant mental health, Bricker had a duty to verify the credibility of Kelly Tyler's reports and view RB's interactions with Plaintiffs before attributing the unverified behavior to the Warrans, particularly when she knew that MCI would rely on her report to determine RB's best interests.

Bricker also participated in the Family Team Meeting preceding the first overnight the MCI Superintendent had scheduled for the Warrans and was part of the tacit agreement, among those present, to deceive the Warrans into believing that through their counsel they, too, would be represented in a group conference with the MCI Superintendent the next day and did not inform the Warrans that, as a group, they had already met with the MCI Superintendent and successfully persuaded her to withdraw permission for the overnights.

By her intentional acts and omissions, including her extraordinary effort to belittle, mock and weaken the ties between RB and the Warrans, Bricker became an integral part of the conspiracy to deprive Plaintiffs of their constitutional rights to due process and equal protection of the law.

F.   <u>Defendants Hillsdale CASA, Inc., Upton and Draper</u>. Defendants Hillsdale CASA, Inc. and its agents, Upton and Draper, as well as Upton and Draper, individually, knew or should have known of the limited role they were authorized to play in the child welfare proceedings but, notwithstanding the limitations, they aligned themselves with Kelly Tyler and Draper became a daily presence in the Tyler home, to the extent that Draper assumed the position of Kelly Tyler's alter ego and went on to become the Tylers' passionate advocate whose emotional response to the child welfare case demonstrated her lack of professionalism and integrity.

Draper, further, exceeded her authority as a trained CASA by becoming emotionally involved in Ms. Tyler's foster home to the extent that she was seen following, surveilling, and photographing the Warrans' unsupervised visits with RB and arguing, later, with anyone who would participate, that she had every right to be anywhere RB was at any time.

Draper, in fact, is believed to have been instrumental in forming what was casually referred to as "Team Kelly" including all named Defendants except for Judge Bianchi and Superintendent Moore whom Plaintiffs doubt were part of the organized groupthink that was the proximate cause of Judge Bianchi's failure to comply with Michigan statutes and court rules or Superintendent Moore's final decision.  In fact, the MCI Superintendent cited a single factor as the compelling reason for her decision, i.e., the length of time RB had lived in the Tyler foster home which, in turn, was a direct and proximate result of the Defendants' organized conspiracy to delay, impede and hinder the ICPC process and RB's visits with the Warrans.

G.   <u>MCI Superintendent Moore</u>.  Superintendent Moore, as a result of the constant pressure placed on her by "Team Kelly," including the named Defendants other than Judge Bianchi[3], failed to conduct her own investigation into RB's best interests and, instead, succumbed to the group's false reporting and constant coercion.  Superintendent Moore, after Team Kelly urged her to terminate Plaintiffs' scheduled overnight visit with RB, responded that she felt she had no choice but to suspend the Warrans' overnight visits with RB due to the opinions of the "team."

Superintendent Moore further failed to independently investigate or respond to Plaintiffs' many questions related to RB's foster care, including the delay initiating the ICPC process, MCI's failure to address the issue of relative placement as an alternative to the Tyler foster home, the LGAL's departure from Michigan law to petition for and secure orders that usurped MCI's jurisdiction over the visitation schedule between RB and Plaintiffs.

Further, Superintendent Moore took no action when informed by the Warrans' attorney of Bricker's cruel and deliberate construction of the scrapbook, designed to taunt, and ridicule the Warrans after they had, in an act of generosity and grace, provided her with the pictures she then cut and pasted to show a fictionalized version of "RB's Story."  Superintendent Moore did not object to Bricker's clear message to the Warrans, long

---

[3] Plaintiffs do not believe Judge Bianchi intentionally joined the organized conspiracy involving the other Defendants but nevertheless, willfully, and purposefully departed from her duties and responsibilities as an impartial probate court judge by entry of illegal orders based upon inadmissible hearsay and the vague allegations of GAL Nickerson.  Judge Bianchi further refused to set the mandatory hearing following issuance of the TRO, refused to file and hear Plaintiffs' objections to the illegal orders, refused to file Plaintiffs' motion to intervene and motion for relief from judgment and finalized the Tylers' adoption of RB within hours of receiving consent, with purpose and knowledge that her actions violated the Plaintiffs' constitutional rights to due process and equal protection of law.

before MCI had decided, that they would not be given consent and that the Tylers would be permitted to adopt RB.

Superintendent Moore further failed to address the fact that on May 3, 2022, LeAnna Scott and Dorothy Isaacson of Open Doors sent the Warrans a 16-page recommendation on MDHHS Form CWL 3031 recommending them for adoption. The Warrans' relief and happiness were short lived, however, because within a few days the agency rescinded the recommendation.

The MCI Superintendent never responded, in any way, to the Warrans' legitimate concern about RB's injuries including scars, scratches, bruises and burns on his arms, and the fact that Kyle Tyler, a felon, was permitted to live in the home with RB and be portrayed as his "brother," another person who "loved him."

The MCI never responded to the Warrans' attorneys' multiple comprehensive, lengthy letters, pictures, and videos of the Warrans interactions with RB all of which served as evidence of his attachment and love for his aunt, uncle, and cousins.

The MCI's superintendent's notice was, moreover, dated December 7, 2022, although the postmark bears the date December 13, 2022. The fact that the letter was not put into Plaintiffs' mailbox, by the USPS carrier, until December 19, 2022, strongly suggests that the MCI Superintendent, or one or more of the other named Defendants, purposefully delayed the Warrans' receipt of the notice, to enable the Tylers' adoption of RB to be finalized less than two days later.

VI.     Legal basis for Warran's right to due process of law.

93.     The Right to Substantive Due Process.  Plaintiffs have a protected

liberty interest in preserving their family relationship with their nephew.  Not only

do they have a biological link with him, they developed a close and loving

42

relationship during the visits they were permitted with him. The pictures taken during all the visits document this relationship between the aunt and uncle as well as his cousins. Unlike other cases, this is not one in which family members are competing with family members. Here, parental rights have been terminated and the state has violated its own policies in placing a child in foster care and disrupting family bonds.

94.     The United States Supreme Court has recognized that "ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family." *Moore v East Cleveland*, 431 US 494, 504 (1997).  "The tradition of uncles, aunts, cousins and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition." *Id*.

95.     <u>The Right to Procedural Due Process</u>.  "Due process in civil cases generally requires notice of the nature of the proceedings, an opportunity to be heard in a meaningful time and manner, and an impartial decisionmaker.  The opportunity to be heard does not mean a full trial-like proceeding, but it does require a hearing to allow a party the chance to know and respond to the evidence." *Cummings v Wayne Co*, 210 Mich App 249, 253; 533 NW2d 13 (1965).  The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) a notice of the case against him and opportunity to meet it." *Mathews v*

*Eldridge*, 424 US 319, 348 (1976).  In this case, Plaintiffs were repeatedly denied the ability to participate in the proceedings due to their individual actions and thereby denied procedural due process.

96.    <u>Right to Equal Protection of Law</u>.  Plaintiffs allege that Defendants, jointly and severally, deprived Plaintiffs, RB's uncle and aunt, of the statutory preferences and rights to fairly compete for foster care or relative placement of RB in their home, to have a relationship with RB, and to adopt RB, instead giving preference to the Tylers who, as foster parents, do not have constitutionally protected liberty interests in the custody, care, and management of their foster children. The liberty interest that biological families possess in their privacy and autonomy arises not as a matter of state law, "but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" *Smith v Or of Foster Families For Equal & Reform*, 431 US 816, 845; 97 S Ct 2094; 53 L Ed 2d 14 (1977) (quoting *Moore v City of E Cleveland*, 431 US 494, 503; 97 S Ct 1932; 52 L Ed 2d 531 (1977)).  The nature of the foster care relationship is distinctly different from that of the natural family; namely, it is a temporary arrangement created by state and contractual agreements." *Renfro v Cuyahoga Cty Dep't of Human Servs*, 884 F2d 943, 944 (6th Cir 1989).

97.    Plaintiffs allege that Defendants, jointly and severally, engaged in a civil conspiracy to deprive Plaintiffs of their constitutional rights, that they acted in

concert and with a shared the general conspiratorial objective to deprive Plaintiffs of their constitutional rights, and that their actions committed in furtherance of the conspiracy, caused an injury to Plaintiffs, all of which was done to accomplish an unlawful purpose.  *Hensley v Gassman*, 693 F3d 681, 695 (6th Cir 2012).  *Admiral Ins Co v Columbia Casualty Ins Co*, 194 Mich App 300, 313; 486 NW2d 351 (1992)

98.     With regards to notice requirements, the United States Supreme Court has stated that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v Cent Hanover Bank & Trust Co*, 339 US 306, 314 (1950). "The notice must be of such nature as reasonably to convey the required information and it must afford a reasonable time for those interested to make their appearance." *Id*.

99.     In *Roller v Holly*, 176 US 398, 408-411 (1900), the United States Supreme Court held that five days' notice by personal service was not reasonable notice because it did not adequately provide time for a party to make an appearance. Moreover, "[t]he right of a citizen to due process of law must rest upon a basis more substantial than favor or discretion." *Id*. at 409. It is not enough

that a party receive notice by chance—the law must require it. *Coe v Armour Fertilizer Works*, 237 US 413, 424-425 (1915).

100.   In *FOP v Kalamazoo County*, 82 Mich App 312, 315, 317; 266 NW2d 805 (1978), the Michigan Court of Appeals held that a party did not receive adequate notice when a petition to hold him in contempt was filed, and the contempt hearing scheduled for the very next day. In *Khalifa v Henry Ford Hospital*, 156 Mich App 485, 498; 401 NW2d 884 (1986), the Michigan Court of Appeals noted that one definition of a "fair hearing" used by a justice of our Supreme Court "includes adequate notice of the time and place, a reasonable time for preparation, and an opportunity to present evidence and argument."

VII.   Request for Relief:

Plaintiffs Brian Warran and Laura Warran request this Honorable Court issue a declaratory judgment finding:

A.   Defendants' conspiracy and agreement and individual decision to engage in the intentional acts, omissions and failures described herein violated Plaintiff's rights to substantive and procedural due process and equal protection of law.

B.   As a result of Defendants' violation of Plaintiffs' constitutional rights, they have been caused to expend attorney fees and costs that should be addressed by the state court system.

C.   That the state court should rescind the Order of Adoption dated December 21, 2022, for the purpose of allowing Plaintiffs to exercise the constitutional rights deprived them by Defendants' acts and omissions.

D.  Due to the nature and severity of Defendants' intentional wrongful actions and the damages such actions caused to Plaintiffs, this matter should be heard by a different judge in a different Michigan circuit.

Respectfully submitted,

s/ *Donna Marie Medina*
DONNA MARIE MEDINA (P44562)
WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.
ATTORNEYS FOR BRAIN AND LAURA WARRAN
380 N Old Woodward Avenue, Suite 300
Birmingham, MI 48009
(248) 642-0333
dmm@wwrplaw.com

s/ *Mary M. Conklin*
MARY M. CONKLIN (P39527)
CONKLIN LAW FIRM, PLC
CO-COUNSEL FOR BRIAN AND LAURA WARRAN
PO Box 1355
East Lansing, MI 48826
(517) 267-1500
marymconklin@gmail.com

Dated: April 6, 2023